The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Hoag. As the appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives, the Full Commission modifies and affirms the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employer-employee relationship existed between plaintiff and defendant-employer at all relevant times.
3. Plaintiff's average weekly wage at all relevant times was $432.27, yielding a compensation rate of $288.32.
4. Defendant is self-insured.
5. A bound volume of plaintiff's medical records were stipulated into evidence.
 ***********
The Full Commission modifies and affirms the findings of fact found by the Deputy Commissioner as follows:
 FINDINGS OF FACT
1. As of the date of hearing before the Deputy Commissioner, plaintiff was a 49 year old female born on 2 July 1947, who was employed by defendant as a driver license examiner in February 1990. Her job duties included administering road tests for licensing for cars, trucks, buses and motorcycles; administering written tests; administering vision tests; using the DMV computer system; and taking driver license photographs.
2. During her employment with defendant-employer, plaintiff has filed at least four workers' compensation claims, only one of which has been found compensable. When questioned about the claims, plaintiff had no memory of them.
3. Plaintiff earned a total of $21,057.58 from 1 January 1995 through 7 December 1995, as shown by plaintiff's 1995 W-2 from defendant, which results in an average weekly wage of $432.27, yielding a compensation rate of $288.32.
4. As a part of her employment with defendant, plaintiff was required to wear at all times a uniform which included synthetic leather (Corfam) work shoes that were provided by defendant to plaintiff. Plaintiff was not allowed to purchase and wear her own work shoes. However, upon request and receipt of a written statement from a doctor, shoes other than the required work shoes would be permitted. Plaintiff never requested permission to wear other than the required work shoes. She did not ask her doctor, Dr. Hagan, for a prescription although he had previously provided such a statement for other DMV workers.
5. Plaintiff had pre-existing non-work related foot problems consisting of bunions and congenital deformities.
6. In June of 1990, at the beginning of her employment with defendant-employer, plaintiff experienced problems with her feet while wearing the required work shoes. Her feet would become hot, they would perspire, swell and plaintiff would experience pain, more in the right foot than the left. According to plaintiff, her symptoms worsened over five years; however, she never complained to her supervisor nor consulted a physician.
7. Plaintiff first sought medical attention for her right foot condition on 13 November 1995 with Dr. Thomas J. Hagan, D.P.M. Dr. Hagan is a podiatrist, certified in foot and ankle surgery by the American Board of Podiatric Surgery and a fellow of the American College of Foot Surgeons. Plaintiff presented complaining of right foot pain which was most severe by the end of a workday while wearing her required work shoes.
8. Plaintiff and Dr. Hagan agreed that plaintiff had pre-existing foot deformities and also foot pain and problems for at least the preceding five years.
9. Dr. Hagan initially diagnosed plaintiff as having a Morton's Neuroma in her right foot. Dr. Hagan treated plaintiff conservatively, injecting the right foot with Celeston Soluspan and Lidocaine, and fitting her with a Berkemann premolded orthotic.
10. On 30 November 1995, plaintiff returned to Dr. Hagan who diagnosed multiple right foot problems, including hallux abducto valgus, hallux abductus, hypertrophic bone-fifth toe, plantar declinated fifth metatarsal and Morton's Neuroma-third interspace, all pre-existing foot deformities. Dr. Hagan recommended foot surgery to correct the problems. Dr. Hagan, at that point, did not advise plaintiff she was suffering from an aggravation or exacerbation of her foot deformities due to work-related conditions. Nor did plaintiff raise the issue of occupational disease. In fact, Dr. Hagan filed a request for permission to operate on plaintiff's foot from her regular medical insurance carrier. Permission was granted.
11. Plaintiff informed her supervisor of the surgery to take place on 8 December 1995. Plaintiff testified that she told her supervisor that she could not wear the shoes without having surgery, and her supervisor stated that plaintiff informed him she was having foot problems which required surgery. However, plaintiff never informed her supervisor that the condition requiring surgery was caused or otherwise due to the shoes she wore as part of her uniform. Plaintiff never complained to her supervisor about her shoes. She never requested permission during the five years of her employment, to wear shoes other than the Corfam shoes supplied at work. Defendant was prejudiced by plaintiff's failure to inform it of the relationship between her shoes and her increasingly deteriorating foot condition. Had plaintiff informed defendant of the problem, her shoes could have been changed and no aggravation of her condition would have occurred.
12. Plaintiff never asserted that her pre-existing foot deformities were aggravated by her work conditions until more than a year after her surgery, when she was diagnosed with Reflex Sympathetic Dystrophy (RSD) resulting from the surgery.
13. On 8 December 1995, Dr. Hagan performed surgery on plaintiff's right foot, which surgery included an osteotomy of the first metatarsal to correct a bunion; an osteotomy of the great toe to straighten the big toe; an osteotomy in the second metatarsal to raise it up to relieve pressure from the bottom of the foot; removal of a Morton's Neuroma, and a hemiphalangectomy of the fifth toe. Plaintiff's regular health insurance approved the operation and paid the medical costs.
14. After her surgery plaintiff followed up with Dr. Hagan who treated her conservatively, including changing her dressing, giving injections and prescribing medication for swelling, removing her sutures, immobilizing her right foot with an unna boot, and prescribing Darvocet for pain.
15. On 12 February 1996, plaintiff returned to Dr. Hagan for a follow-up of the original surgical procedure of 8 December to remove a wire, to remove a pin and to remove a saddle bone deformity.
16. The work shoes worn by plaintiff aggravated her pre-existing, non-disabling, non-work related right foot condition. However, the shoes which were issued as part of plaintiff's uniform were not required as a condition of employment, but could have been and were in other cases, replaced by shoes which would not aggravate plaintiff's pre-existing condition.
17. After her second surgery on 16 February 1996, plaintiff followed up with Dr. Hagan who treated her conservatively. On 4 March 1996, Dr. Hagan released plaintiff to return to work on 5 March 1996 under light duty restrictions. She was to perform inside work only and not to administer any road or truck tests.
18. On 5 March 1996, plaintiff reported to work and presented a note regarding Dr. Hagan's work restrictions to her immediate supervisor.
19. Plaintiff's district supervisor instructed her to fax him a copy of Dr. Hagan's restrictions, which she did. Plaintiff's district supervisor then told her that he would have to telephone someone in defendant-employer's Raleigh office to check on the availability of light duty work. At approximately 9:00 AM, on 5 March 1996, plaintiff's district supervisor called plaintiff back and advised her to go home because defendant-employer had no light duty work available for plaintiff. Plaintiff has never looked for other work.
20. On 14 March 1996, plaintiff returned to Dr. Hagan complaining of right foot discomfort, difficulty wearing a shoe, difficulty sleeping and an inability to take the medication Lasix for the swelling. Dr. Hagan changed her medication for the swelling to Dyazide, prescribed Lorcet for pain and Amitriptyline for the difficulty in falling asleep.
21. On 4 April 1996, plaintiff returned to Dr. Hagan complaining of increased pain and described a feeling of fullness in her right foot. Plaintiff was suffering from Reflex Sympathetic Dystrophy (RSD) of her right foot. Dr. Hagan referred plaintiff to Dr. James M. Tarpley, M.D. at New Bern Anesthesia Associates for diagnosis and further treatment.
22. On 16 April 1996, plaintiff was examined by Dr. Tarpley diagnosed RSD based on the following objective findings: two (2) degrees centigrade difference in the two extremities with the affected extremity being of the lower temperature, swelling, mottling of the skin, cyanosis of the skin, early atrophy of the epidermis, dependent edema, allodynia and discoloration.
23. Dr. Tarpley then performed a sympathetic nerve block on plaintiff which resulted in temporary, 100% resolution of plaintiff's pain.
24. RSD is a painful condition that is primarily mediated by the sympathetic versus the somatic nervous system and that comes from trauma, including surgery. The most up-to-date nomenclature for RSD is "Complex Regional Pain Syndrome, Type I". The pathophysiology of RSD is an over stimulation of the sympathetic nervous system from trauma or tissue damage, which causes changes in the dorsal horn and the spinal cord, and which causes pain to persist even after original injury has healed.
25. Plaintiff was treated for RSD by Dr. Tarpley from April to June 1996, which treatment included lumbar sympathetic blocks, intravenous regional blocks, an intravenous bretyline block, pain medication and physical therapy. However, plaintiff's RSD did not improve. The blocks resulted in temporary pain relief only.
26. On 2 July 1996, plaintiff was seen by Dr. Tarpley's partner at New Bern Anesthesia Associates, Dr. G. Montgomery Baylor, M.D., a board certified anesthesiologist specializing in the areas of operative anesthesiology and pain management. Dr. Baylor is fellowship trained and board eligible in the subspecialty of pain medicine and has treated approximately fifty (50) patients who have suffered from RSD as the result of surgery. Dr. Baylor's examination revealed that plaintiff was suffering from basically the same symptom complex as found by Dr. Tarpley.
27. Plaintiff's RSD of her right lower extremity was caused by the surgeries performed on plaintiff's right foot on 8 December 1995 and 16 February 1996 by Dr. Hagan.
28. As a result of the surgeries performed on plaintiff's non-disabling and pre-existing right foot deformities on 8 December 1995 and 16 February 1996 by Dr. Hagan, plaintiff developed RSD of her right lower extremity and subsequently her left lower extremity, which has resulted in chronic, disabling pain. However, there is no evidence that plaintiff's disability is permanent and total, and plaintiff has never received a rating.
29. On 3 July 1996, plaintiff saw Dr. Novak who diagnosed plaintiff as suffering from depression which, in his professional opinion, was largely related to plaintiff's RSD pain.
30. Plaintiff first provided defendant with notice of the allegation that her foot condition was work-related when she filed her claim for compensation in November 1996.
 ***********
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff argues that she contracted an occupational disease of her right foot by virtue of aggravating a pre-existing, non-disabling and non-work related right foot condition. An occupational disease must be proven to be due to causes and conditions which are characteristic of and peculiar to the employment. N.C. Gen. Stat. § 97-53(13). A disease is characteristic of or peculiar to a profession when there is a recognizable link between the nature of the job and an increased risk of contracting the disease in question. Booker v. DukeMedical Center, 297 N.C. 458,472, 256 S.E.2d 189 (1979). The "peculiar to" requirement means that the occupation must create a hazard for the contraction of this disease greater than that found in the general run of occupations and in excess of that attending employment in general. Keller v. City ofWilmington Police Dept., 65 N.C. App. 675, 309 S.E.2d 543
(1983); Booker at 473.
2. Plaintiff contends that her non-occupational disease was aggravated by the work requirement of wearing special shoes. When a disease is non-occupational, the disease must have been aggravated or accelerated by causes and conditions characteristic of and peculiar to plaintiff's employment. Walston v.Burlington Mills, 304 N.C. 670, 285 S.E.2d 822, as amended,305 N.C. 296, 297, 285 S.E.2d 822, 828 (1982). The uncontradicted evidence shows that the shoes which were issued as part of plaintiff's uniform were not a requirement of her employment, but could have been replaced upon her request with shoes which accommodated plaintiff's condition. Plaintiff's decision to continue wearing shoes which aggravated her condition could have occurred in any occupation; therefore, the shoes in question do not constitute a condition of plaintiff's particular trade, occupation or employment. Accordingly, any aggravation of plaintiff's non-disabling, pre-existing condition, the surgery, the resulting RSD, and any subsequent disability therefrom, are not the result of causes and conditions characteristic of and peculiar to claimant's employment. N.C. Gen. Stat. §97-53(13); Id.
3. Plaintiff is responsible for providing employer with notice of her occupational disease in accordance with the mandates of N.C. Gen. Stat. § 97-22. "The time of notice of an occupational disease shall run from the date that the employee has been advised by competent medical authority that he has same." N.C. Gen. Stat. § 97-58(b). N.C. Gen. Stat. §97-22 provides that an employee must give an employer written notice of the existence of the [occupational disease] immediately, unless it can be shown that the employer, his agent or representative, had knowledge of the [occupational disease], or that the party required to give such notice had been prevented from doing so by reason of physical or mental incapacity, or fraud or deceit of some third person; but no compensation shall be payable unless such written notice is given within 30 days after the occurrence of the [occupational disease], unless reasonable excuse is made to the satisfaction of the Industrial Commission for not giving such notice and the Commission is satisfied that the employer has not been prejudiced thereby.
Plaintiff received medical knowledge of her condition as early as 13 November 1995. Although Dr. Hagen did not tell plaintiff that her problems were related to her shoes, plaintiff testified that she had related her discomfort to the shoes for the previous five years. Even after her surgery, plaintiff failed to inform defendant of the relationship between her shoes and her condition until she filed a claim under the Act in November 1996. By waiting to provide defendant with notice until after she had voluntarily aggravated her condition for five years and an additional year after she had surgery on her foot, plaintiff effectively eliminated defendant's opportunity to alleviate the problem by allowing plaintiff to wear different shoes. Accordingly, defendant was prejudiced by plaintiff's failure to give timely notice, and plaintiff is statutorily barred from claiming compensation under the Act. N.C. Gen. Stat. § 97-22.
4. Plaintiff has not suffered an occupational disease arising out of and in the course of the employment with defendant-employer. N.C. Gen. Stat. § 97-53(13). Plaintiff does not have a compensable disability, because any inability to earn wages in her former employment with defendant-employer is the result of surgery for a non-occupational disease and/or subsequent complications arising therefrom. N.C. Gen. Stat. § 97-52.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. Plaintiff's claims for disability are and must be DENIED.
2. Each side shall bear its own costs
 S/ _____________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
S/ _____________ RENÉE C. RIGGSBEE COMMISSIONER
S/ _____________ CHRISTOPHER SCOTT COMMISSIONER
DCS:jbd